## ENGLER v. GENERAL ELECTRIC CO.
### No. 250.

Circuit Court of Appeals, Second Circuit.
July 28, 1944.

Ring & Murray, of New York City, for appellant.

Alexander C. Neave, of New York City (Prowell S. Mack, of Schenectady, N. Y., of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The appellant is the owner of United States Patent No. 1,492,972 which was granted to him on May 6, 1924, upon his application filed December 5, 1911. The patent expired during the pendency of this suit. It is for "Dynamo Electric Machinery" described in the specifications which disclose a special homopolar dynamo that will operate as a generator to transform mechanical energy into direct electric current and will also, as will most dynamos, run as an electric motor to transform electrical energy into mechanical energy.

He brought this suit against the appellee in the District Court for the Southern District of New York for infringement of claims of his patent, which by a pre-trial order were limited to those numbered one to eight inclusive and of which it is agreed that eight may be taken as typical. That reads on an electric motor, and the accused machine is a motor which will not operate as a generator. The first seven claims read on a direct current generator.

The appellant, who at first acted as his own attorney, included in his complaint a count under R.S. § 4918, 35 U.S.C.A. § 66, alleging that claims of his patent one to eight inclusive were in interference with all the claims of five patents owned by the defendant, which claims exceeded one hundred in number. By pre-trial order, however, the issue on interference was limited to claims one to eight inclusive of Patent No. 1,993,581 granted to Alexanderson and claims one to nineteen inclusive, claim 26, and claims 32 to 45 inclusive of Reissue Patent No. 20,364 granted to the same patentee. The district judge, holding that this cause of action was moot because the plaintiff's patent had expired, dismissed the interference count and the appellant appealed.

In the appellant's complaint there was also included a count based on unfair competition which was dismissed below with his consent. By that time he had been granted leave to prosecute his suit in forma pauperis, and his present attorneys had been assigned by the court to assist him. They are to be commended for the painstaking manner in which they have performed their duty in a case which has been well briefed and argued by the attorneys for both parties.

The specifications of the patent in suit make clear the distinction between the patented machine and the more common kind of homopolar dynamo, as follows:

"In the machine the operation of which I here show and describe, the magnetic poles and lines of force of the field shift or rotate with respect to the mass of the iron of the field, and that iron which at one instant may be a north pole will at another instant be a south pole. Thus the magnetic poles shift continuously and progressively in the iron. However, any given armature conductor in the type which I disclose always remains in a field of the same polarity and cuts the lines of force of that field. Now, in the ordinary homopolar machine, the lines of force at any given point in the iron remain at that point whether the field rotate and the conductor be stationary or vice versa, whereas, in my machine the lines of force grow up and remain stationary in the iron of the field magnet during an arc of rotation of the field equal to the breadth of the armature coils and then they die out, considering the armature coils as stationary."

It will be helpful to describe the patented machine and its operation first as a direct current generator, always keeping in mind the fact that it can be turned into a motor simply by disconnecting the supply of mechanical energy to its rotor, which makes the latter revolve when it is used as a generator to produce electricity, and connecting its stator to a power current which will reverse the operation and thereby create mechanical energy in the rotor. Any generator produces electricity when the magnetic lines of force about the north and south poles of an electro-magnet, which are known as flux, are so associated with an armature usually made of wire wound around an iron core, that movement cuts the lines of force. That creates a difference of electrical pressure, called voltage, which makes a flow of current. It

does not matter whether the electromagnet or the armature moves relative to the other. The voltage is induced in the armature, and the electro-magnet which produces it is called the field. When the coil of the armature is in a closed circuit, but not otherwise, there is a flow of current and the generator has an output of electricity.

Such electricity may be either alternating, as in most commercial generators, or direct. As the appellant's construction was one in which the electromagnet was the rotor and the armature was stationary, further discussion will for simplicity be confined to that type.

In that machine the armature was shaped much like a doughnut and the field revolved within the hole like a stick turning on a pivot at its center. When a supply of current was led in to this rotor it became an electromagnet with one end a north pole and the other a south pole. If it should be rotated within the armature while this condition as to its poles remained constant, the flux at the north pole would be cut first by the coil on one side of the armature and then the flux at the south pole would be cut in the same way by the same coil as the rotor revolved, and so the current generated would alternate from one value to the other as the same coil successively cut the flux at the poles of opposite value. This would produce symmetrical alternating current in a way old before this patent.

The appellant, however, wanted to generate direct current and to do so needed to do away with the successive cutting by the same coil of the lines of force associated with poles of opposite value. He did so by reversing the polarity of the field so that the same side of the armature would always face, not the same end of the rotor, but the same pole of the rotor because as the position of the ends was reversed during a turn the polarity of the ends was reversed in synchronism. The appellant's preferred way to bring about this reversal of polarity was by reversing the current which magnetized the field, but he did not confine his reversal to that particular method and his patent should not now be so construed. His claims, however, are all tied to a reversal of polarity and it will be convenient and adequate for present purposes to speak of current reversal in the field and polarity reversal as synonymous as they, indeed, are though current reversal is but one way to bring about polarity reversal.

When the appellant reached this point in making his generator he would have been able to produce direct current and nothing else but for the fact that the reversal of polarity in the field itself induces current in the armature and this current so created in the armature of such a generator is always of a value opposite that which the machine is otherwise producing. Thus the appellant then did not have an output of direct current solely but obtained a dissymmetrical kind of alternating current.

In order to make this unwanted current ineffective he added what he now, calls a trigger circuit, which need not be described in detail but which was so connected to his machine that this current was kept from interfering with the direct current output. This had no part in creating the reversal of polarity but had to do only with one of the results of that reversal. In the end, therefore, the appellant so contrived that the already well known alternating current generator was made to produce direct current with the aid of his reversal of polarity in the field plus his trigger circuit to keep the current induced by that polarity reversal out of the armature.

It is not to be thought, however, that he was a pioneer inventor of a direct current generator. A generator which made use of a reversal of the polarity of the field, was disclosed in 1899 by Robinson in British Patent No. 20,328, but as we find it unnecessary to pass upon the validity of the claims in suit no good purpose will be served by comparing the two machines. The fact is of some consequence only in respect to the range of equivalents on the subject of infringement, which is, as will be seen, the critical point on this appeal.

The appellant's generator when used as a motor was also equipped with the trigger circuit to make ineffective what current was then generated by the reversal of polarity in the rotor. This was not necessary when the machine ran as a motor because the current so created in it then was of the same value as the input current and interfered only in periodically adding to that. The motor would run whether or not there was a trigger circuit to stifle that added current and would simply run more evenly with one.

There are other ways to produce direct current. A common one is to generate alternating current and then turn it into direct current by means of a commutator. For reasons which need not be stated the

machine described in the patent in suit has made no impression upon the art. Not one has ever been sold by the appellant and he has never succeeded in getting anyone to take a license under his now expired patent.

When operating as a motor the patented machine needed the reversal of polarity in the rotor—the field of the generator—to make the rotor revolve. If direct current was fed to the stator—the armature of the generator—in the well known way the core of the armature would become the magnet of the motor's stator. A north pole would exist in one of the spaces between the two halves of the stator coil and a south pole would be at the opposite space between the halves of that coil. As like poles repulse each other and unlike poles attract, the north pole of the rotor would turn to the south pole of the stator and the south pole of the rotor to the north pole of the stator and there the poles would "lock" and hold the rotor without further movement. To overcome this, Engler reversed the polarity of the rotor just before locking occurred, and did so in the same way and by the same means he reversed it when the machine operated as a generator. That enabled the stator magnet to exert a continuous pull upon the rotor and made it revolve unimpeded by locking. Since a reversal of polarity can be accomplished otherwise than by a reversal of current, as Engler disclosed, and as he is not limited by his claims to a reversal of current as the means by which rotor polarity is reversed, he finds ground for contending that the accused machine about to be described has the equivalent of the polarity reversal of claim 8 of his patent. Neither the so-called trigger circuit nor anything which accomplished the same result is present in the accused motor.

The appellee's machine which the appellant has alleged is an infringement of the first eight claims of his patent is a special type of electric motor and is the only one ever built so far as this record discloses. It may be a homopolar motor in the sense that the appellant used that term in his specifications, but that is of little significance because if so, as will be seen, it is another special type which does not have Engler's reversal of polarity in the field or its equivalent and does not make use of a trigger circuit at all.

Engler claimed a combination in an electric motor which included both of these

features as is shown by claim 8 which follows:

"8. In an electric motor the combination with a plurality of power windings and a plurality of magnetic members of reversible polarity relatively rotatable and in mutually inductive relation, of current supply for causing motion of said members relatively to said windings to produce useful work thereby, means for reversing the polarity in a synchronous cycle and means for rendering ineffective the electromotive force induced by said reversals."

The appellee's machine is in large part made like a synchronous motor and may fairly, though not altogether accurately, be called a variable speed synchronous type motor. Instead of the magnetic poles which spin around the stator of a synchronous motor when alternating current is supplied it and which lock with an opposite pole of the rotor to carry the latter around at a fixed speed which remains constant at the frequency with which the current alternates, the appellee's motor has stator windings physically displaced in groups one third of the way around the core. The power supply is alternating current rectified by thyratrons to turn it into direct current which flows successively during one third of a rotor revolution into each stator winding, and at the same time this direct current flows into the rotor field winding so that the latter is continuously excited by direct current. That makes the rotor a magnet with north and south poles that remain constant and never reverse. This is so because the thyratrons through which the current is supplied can, and do, let it flow in only in one direction so that the current in the rotor winding is always flowing in the same direction. What makes the rotor turn without locking is not a reversal of polarity but the fact that just before locking can take place the stator winding thus approached by the rotor pole it has attracted to it is deenergized and the next winding energized to attract it on around the stator. It thus follows a series of opposite poles which are successively created, done away with, and recreated around the stator but it never quite gets to locking position with any one of them because when it is physically in position for that such a stator pole is nonexistent. There is only a piece of iron around which a wire is coiled. In contrast with the rotor pole of a synchronous motor which is locked with the spinning poles of the stator, the rotor pole of the appellee's rotor constantly tries in vain to lock with poles in the stator which appear and vanish ahead of it.

The rapidity of the setting up of such poles in the appellee's stator is controlled by vacuum tubes here called thyratrons. They have the usual anode, cathode and grid. They are in fact valves which will permit the passage of electricity only when the grid is excited and then only in one direction, which is from the anode to the cathode. Consequently, when alternating current in the power line meets a thyratron it is not let through until the grid has been activated by closing the grid circuit. In the appellee's motor the grid circuit is closed by a distributor mounted on the shaft of the motor, and the distributor can be adjusted to different closure speeds which in turn control the motor speed because that is dependent upon whether the time of the excitation of the grid is advanced or retarded. The distributor does, and needs do, nothing more than cause a stator coil to be cut into the circuit, for the cutting out, or shutting off, of the current which energizes the stator coil is automatic because of the action of alternating current upon the thyratron. When that current goes to a sufficiently low value, as it does when it goes through zero every half cycle, each thyratron and the stator winding supplied with current through it are cut out until the distributor causes the grid circuit to be closed again.

Obviously there is no reversal of polarity of the field magnet in the rotor. Nor is there any actual reversal of polarity anywhere in the machine. There is only the successive cutting in and cutting out of the armature coils in the stator which enables the rotor of the appellee's motor to revolve, and merely in the sense that revolution of the rotor is essential to the operation of any electric motor, that does accomplish what the reversal of polarity in the field does for the patented machine. Both prevent "locking." But there the similarity ends. And when the appellant claimed only a combination which included means for reversing polarity, and it appears that that was the sine qua non of his invention, if he made any at all, proof which shows that the defendant constructed an electric motor which ran with no reversal of polarity at all fails to prove infringement. The term reversal of polarity necessarily implies that polarity

of one sort is changed to polarity which is the reverse of that. When the reversal has been made, polarity still exists and the change occurs with such speed that for present purposes polarity cannot be considered non-existent at any time. That intermittent polarity is not here the equivalent of continuously reversing polarity is made clear by the fact that the latter is a limitation in a patent claim for a device which as disclosed in the specifications must have such continued polarity constantly reversing to operate at all. It is to be taken for granted that the patentee meant what he said when he limited his claims in plain words to that essential feature of his machine. He then made his bargain and now must abide by it. Ajello v. Pan-American Airways Corp., 2 Cir., 128 F.2d 196. It will not help his cause as he now argues, to say that he might have prevented locking by successively cutting out and cutting in armature coils to make polarity non-existent periodically and so obviate locking by means of intermittent polarity. He did not secure patent claims broad enough to cover generally the prevention of the locking of the field and the armature in an electric motor. That, per se, was not new and accomplishing it in a way like that the appellee employed by cutting out and later cutting in armature coils was itself very old, as the Leyser's German Patent No. 23,880, granted in 1883, well shows.

Moreover, the absence of any reversal of polarity in the accused machine results in an absence of any electromotive force induced by such reversals and there is no means, by a trigger circuit or otherwise, for rendering that non-existent force ineffective. The trial judge was quite right when he held that no infringement of the claims in suit had been shown.

Nor was he in error when he dismissed the interference count on the ground that such a suit could not be prosecuted after the patent had expired. R.S. § 4918 in terms provides a remedy only when there are interfering patents. An applicant for a patent may not maintain a suit under the provisions of this statute before his patent is granted. See, United Shoe Machinery Corporation v. Muther, 1 Cir., 288 F. 283, 287. For like reasons the owner of an expired patent cannot maintain such a suit since the claims of an expired patent are no longer of any force or effect and cannot be in interference with those of any other patent. The suit is in personam in equity and does not "affect the right of any person except the parties to the suit and those deriving title under them subsequent to the rendition of such judgment." Jurisdiction of a cause of action under R. S. § 4918 must be supported by proof that there are patents in existence each of which has one or more claims which cover the same invention in whole or in part. Nathan Mfg. Co. v. Craig, C. C., 49 F. 370; Stonemetz Printers' Machinery Co. v. Brown Folding Machine Co., C. C., 57 F. 601. Since the contrary appears, dismissal of that count was correct.

Decree affirmed.